IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| LISA SANDERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | No. CIV-16-435-D |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of Defendant Commissioner denying her applications for disability insurance and supplemental security income benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 416(I), 423, 1382. Defendant has answered the Complaint and filed the administrative record (hereinafter TR___), and the parties have briefed the issues. The matter has been referred to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B). For the following reasons, it is recommended that the Commissioner's decision be affirmed.

I. Background and Medical History

Plaintiff filed her applications for benefits on January 17, 2011 (protective filing date), and alleged that she became disabled on January 7, 2011, due to ankylosing spondylitis (arthritis) in her back and neck, costochondritis (chest wall pain), chronic obstructive

1

pulmonary disease ("COPD"), emphysema, and obstructive sleep apnea. Plaintiff has a twelfth grade education and previous work as a finance specialist. She was 44 years old at the time she filed her applications.

In a written function report, Plaintiff described limitations in lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, vision, concentration, use of her hands, and getting along with others. She used an ankle brace mostly at night that was prescribed following right ankle surgery in May 2011 but no walking or other aide.

Plaintiff's medical record reflects that in a surgical procedure performed by Dr. Ringus in May 2011 a "loose body" of cartilage was removed from Plaintiff's right ankle and arthroscopy was performed. (TR 444). Dr. Ringus, who performed the ankle surgery, noted that Plaintiff did well post-operatively and she was prescribed a boot and physical therapy in June 2011. Dr. Ringus noted in August 2011 Plaintiff was doing well, had full strength and range of motion in her right ankle and intact neurologic function, and she was released from care with follow-up as needed.

The medical record contains office notes of treatment of Plaintiff by a number of physicians for COPD treated with inhalers, ankylosing spondylitis treated with medications and steroidal injections, obstructive sleep apnea treated with CPAP machine, osteoarthritis treated with medication, hypertension treated with medication, and gastrointestinal reflux disease ("GERD") treated with medication, as well as an episode of costochondritis (chest wall pain) in October 2010 treated with medications.

Plaintiff was diagnosed with ankylosing spondylitis in 2005. She was treated with the

medication Enbrel® and reported that it helped tremendously. In March 2011, Plaintiff was seen by Dr. Boehm, an orthopedist. Dr. Boehm noted that an MRI of Plaintiff's lumbar spine showed degenerative spondylolisthesis at one level, no definite spondylolysis, bilateral degenerative facet joint disease, and mild to moderate central canal stenosis with bilateral lateral recess stenosis and mild bilateral neuroforaminal stenosis. Dr. Boehm recommended conservative treatment measures, including an epidural steroid injection, an increase in the dosage of her prescribed gabapentin medication, and continuation of her prescribed pain medication and muscle relaxant medication as needed.

In April 2011, Plaintiff began treatment with Dr. Malik who noted a physical examination of Plaintiff was normal except for mildly limited range of motion in her cervical spine, some tenderness in her wrists and fingers, full range of motion in her wrists and elbows, and some tenderness with palpation of her lumbar spine. Dr. Malik prescribed medications for her arthritis. Plaintiff reported to Dr. Malik in July 2011 that Enbrel® was helping. He prescribed muscle relaxant medication and a pain medication injection for her complaints of neck and back pain.

Plaintiff sought treatment from Dr. Merkey, a neurologist, in November 2011. The diagnostic impression was peripheral neuropathy and lumbar radiculopathy. MRI, electromyography, and nerve conduction testing was recommended. In May 2012, Plaintiff returned to Dr. Malik for follow-up and complained of increased pain in her hips and cervical spine. Dr. Malik prescribed muscle relaxant medication.

In December 2012, Dr. Malik referred Plaintiff to another neurologist, Dr. Zubair. In

an examination by Dr. Zubair, Plaintiff complained of symptoms of numbness, burning, tingling, pain, cramping, hypersensitivity and allodynia in her toes and the bottoms of her feet beginning one to two years previously and occurring all day, especially in the evenings and lasting "hours." (TR 724). The diagnostic impression was small fiber painful neuropathy with several possible causes for which Dr. Zubair advised Plaintiff to continue her prescribed gabapentin medication.

In a follow-up examination, Dr. Zubair noted that EMG testing failed to show any significant neuropathy. Plaintiff was found to have low B-12 and ferritin levels, and she was started on B-12 injections and advised to continue the prescribed gabapentin, which she stated was helping her symptoms. Plaintiff also complained of a long history of low back pain that "comes and goes." (TR 729). Dr. Zubair prescribed a short-term use of pain and muscle relaxant medications and physical therapy for her low back pain.

In May 2013, Plaintiff returned to Dr. Zubair for follow-up and reported that the gabapentin medication was helping, that physical therapy helped her back pain, and that her back pain was "much better." (TR 737). She was advised to continue the physical therapy and continue the gabapentin and B-12 injections. The previously-prescribed pain and muscle relaxant medications, to be taken as needed, were continued for a short term.

In April 2012, Plaintiff returned to Dr. Ringus and complained of left knee pain. Dr. Ringus noted that MRI testing showed a laterial meniscal tear, and Dr. Ringus conducted a left knee arthroscopy and lateral debridement of the knee in May 2012.

In a consultative psychological evaluation of Plaintiff conducted for the agency by Dr.

Fuchs in November 2011, Plaintiff complained of arthritis, mobility issues, fatigue, COPD, sleep apnea, pain, and depression. She was taking muscle relaxant and pain medications and drove herself to the evaluation. The diagnostic impression was dysthymic disorder and pain disorder with traits of compulsivity and gregariousness. With respect to her mental functional abilities based on an interview and mental status examination, Dr. Fuchs noted that Plaintiff exhibited no impairment in understanding and memory, moderate to severe interference in concentration and persistence "at times as a result of lack of stamina (respiratory issues and fatigue), pain and discomfort. [She m]ay have trouble with regular attendance as a result." (TR 649). She exhibited no impairment in the area of social interaction and no impairment in adaptation.

An agency medical consultant, Dr. Kampschaefer, reviewed the record and opined in November 2011 that Plaintiff was capable of performing simple and some complex tasks, relating to others on a superficial work basis, and adapting to a work situation.

Plaintiff's primary care physician, Dr. Livingston, treated Plaintiff for various minor conditions, including sinusitis, bronchitis, benign hypertension, and dermatitis. Plaintiff reported in January 2011 that she continued to smoke and had smoked a pack of cigarettes a day for 25 years.

In December 2010, Dr. Goldberg, a pulmonary specialist, noted that Plaintiff's COPD was "about as stable as can be expected on medical therapy and . . . [s]he remains at high risk for developing worsening obstructive lung disease with ongoing smoking." (TR 293). Dr. Goldberg noted that he advised Plaintiff to stop smoking and that Plaintiff's obstructive sleep

apnea was stable on nasal CPAP therapy.

In August 2012, Dr. Goldberg noted Plaintiff returned for follow-up and she was "smoking more than ever." (TR 779). The physician also noted that Plaintiff's COPD was stable on medical therapy and her shortness of breath symptoms were much improved. Her sleep apnea and periodic leg movement disorders were also stable.

In June 2013, Dr. Goldberg noted that Plaintiff returned for follow-up and she was still smoking, was compliant with her inhaler medications, and complained of "some shortness of breath with exertion" but no coughing or wheezing or recent respiratory infections. (TR 776). Plaintiff was again advised to stop smoking.

In February 2013, Plaintiff sought treatment from Dr. McArthur, an orthopedic specialist. Dr. McArthur prescribed medications, and in May 2013 Dr. McArthur prescribed Remicade® medication for her ankylosing spondylitis. (TR 809). In March 2013, Plaintiff returned to Dr. Livingston for treatment and stated that she was taking antibiotic medications for pneumonia diagnosed at a hospital emergency room. She continued to use her prescribed inhalant medications and continued to smoke daily. She was prescribed steroidal anti-inflammatory and pain medications.

Plaintiff sought treatment from Dr. Kim in July 2013. She complained of constant neck pain radiating into her spine, lower back, and left hip and hand, as well as pain in her abdominal area from a hernia, burning feet, and chest pain. She was taking narcotic pain medication, gabapentin, inhaler, and anti-depressant medications daily. After an examination, Dr. Kim's diagnostic impression was fibromyalgia, costochondritis, rheumatoid

6

arthritis, lumbar and thoracic sprain, and COPD. She was prescribed muscle relaxant medication and she was advised to being yoga therapy and quit tobacco products.

Plaintiff returned for follow-up treatment from Dr. Kim in August 2013, and Dr. Kim amended his diagnosis to: "SPRAIN THORACIC REGION," "MYALGIA AND MYOSITIS," and "RHEUMATOID ARTHRITIS." (TR 972). Dr. Kim prescribed pain and muscle relaxant medications.

Dr. Barnes, an orthopaedic surgeon, completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) dated November 2, 2013, and also completed written interrogatories concerning Plaintiff's impairments and the severity of those impairments.

In December 2013, Plaintiff was treated in a hospital for pneumonia and COPD exacerbation. She sought treatment from Dr. Goldberg following her discharge for her complaint of severe shortness of breath. Dr. Goldberg noted that Plaintiff was alert, appropriate, very pleasant, and in no distress. The pulmonologist noted that Plaintiff's pulmonary testing showed a decrease in pulmonary function from previous testing with "severe obstruction which is much worse." (TR 990). Steroidal anti-inflammatory and anti-nausea medications, oxygen, and inhalant medications were prescribed.

Plaintiff, Dr. Brahms, a medical expert ("ME"), and a vocational expert ("VE") testified at a hearing conducted on September 12, 2013, before Administrative Law Judge Levine ("ALJ"). During the hearing, Dr. Brahms testified that based on his review of the medical record Plaintiff would be capable of performing light work although she should

7

avoid repetitive lifting below waist level and avoid ladders, ropes, scaffolds, heights, and hazardous machinery, and she should not perform more than occasional kneeling, stooping, or crawling. Dr. Brahms testified that Plaintiff has an impairment due to ankylosing spondylitis, which is a rheumatology disease, COPD, a spleen problem, low back pain, and an elevated glucose level.

II. ALJ's Decision

In a decision entered August 27, 2014, the ALJ reviewed the medical and non-medical evidence and found that Plaintiff had not engaged in substantial gainful activity since January 7, 2011, her alleged disability onset date. Following the agency's well-established sequential evaluation procedure, the ALJ found at step two that Plaintiff had severe impairments due to inflammatory arthritis and COPD. The ALJ found at step three that these impairments or a combination of the impairments did not meet or medically equal the severity of a listed impairment. At step four, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform work at the light exertional level "except that she would need to change positions at a workstation without breaks. She could not climb ladders/ropes/scaffolds. She could occasionally climb stairs, balance, and stoop, kneel, crouch, or crawl. She could occasionally handle, finger, feel or grip." (TR 20). Based on this RFC for work, the ALJ found that Plaintiff was not able to perform her past relevant work.

Reaching the fifth and final step of the sequential analysis, the ALJ found that, considering Plaintiff's vocational characteristics (age, education, work experience) and RFC for work, she was capable of performing work available in the economy, including the jobs

of election clerk and call out operator. Relying on the VE's testimony concerning the availability of these jobs for an individual with Plaintiff's RFC, the ALJ found that 60% of election clerk positions are full-time, warranting a reduction in the number of those jobs available in the economy, and that 90% of call out operator jobs are full-time, warranting a reduction in the number of these jobs available in the economy. Based on these findings, the ALJ denied Plaintiff's applications for disability benefits.

The Appeals Council denied Plaintiff's request for review, and therefore the ALJ's decision is the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481; Wall v. Astrue, 561 F.3d 1048, 1051 (10th Cir. 2009).

III. General Legal Standards Guiding Judicial Review

The Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and whether the correct legal standards were applied. Wilson v. Astrue, 602 F.3d 1136, 1140 (10th Cir. 2010); Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance." Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007). The "determination of whether the ALJ's ruling is supported by substantial evidence must be based upon the record taken as a whole. Consequently, [the Court must] remain mindful that evidence is not substantial if it is overwhelmed by other evidence in the record." Wall, 561 F.3d at 1052 (citations, internal quotation marks, and brackets omitted).

The Social Security Act authorizes payment of benefits to an individual with

9

disabilities. 42 U.S.C. § 401 *et seq*. A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); accord, 42 U.S.C. § 1382c(a)(3)(A); see 20 C.F.R. § 416.909 (duration requirement). Both the "impairment" and the "inability" must be expected to last not less than twelve months. Barnhart v. Walton, 535 U.S. 212 (2002).

The agency follows a five-step sequential evaluation procedure in resolving the claims of disability applicants. See 20 C.F.R. §§ 404.1520(a)(4), (b)-(g), 416.920(a)(4), (b)-(g). "If the claimant is not considered disabled at step three, but has satisfied her burden of establishing a prima facie case of disability under steps one, two, and four, the burden shifts to the Commissioner to show the claimant has the residual functional capacity (RFC) to perform other work in the national economy in view of her age, education, and work experience." Fischer-Ross v. Barnhart, 431 F.3d 729, 731 (10th Cir. 2005). "The claimant is entitled to disability benefits only if he [or she] is not able to perform other work." Bowen v. Yuckert, 482 U.S. 137, 142 (1987).

IV. Sit/Stand Option

Plaintiff contends that the ALJ's RFC assessment is flawed because the ALJ did not specify how often Plaintiff must sit without standing or change positions. The ALJ found that Plaintiff had the RFC for work that allowed her to change positions at a workstation without breaks. (TR 20).

Plaintiff relies on two unpublished Tenth Circuit Court of Appeals decisions, Vail v. Barnhart, 84 Fed. App'x 1 (10th Cir. 2003), and Maynard v. Astrue, 276 Fed. App'x 726 (10th Cir. 2007). But a more recent Tenth Circuit Court of Appeals decision is more persuasive, given the facts presented herein. In Nelson v. Colvin, __ Fed. App'x __, 2016 WL 3865856 (10th Cir. 2016), the claimant argued that the ALJ's RFC determination was too vague because the ALJ did not explain the RFC finding that the claimant would need to periodically alternate between sitting and standing. The ALJ had relied on the RFC assessment by an agency medical consultant stating that the claimant could sit but must periodically alternate sitting and standing to relieve pain or discomfort due to arthritis in her back exacerbated by her obesity.

In this case, Dr. Barnes, an agency medical consultant and orthopedic surgeon, provided a medical opinion based on a review of the medical evidence in the record and stated that in his opinion Plaintiff could sit, stand, or walk each for two hours at a time or a total of 8 hours in an 8 hour workday. (TR 980). The ALJ considered this and other medical evidence in the record and determined that Plaintiff's ability to perform sitting or standing was more limited than Dr. Barnes' assessment and that Plaintiff would need to alternate sitting and standing positions at a workstation without taking breaks. Plaintiff does not point to any evidence in the medical record that would further restrict her ability to perform sitting or standing activities during a normal workday. As in the Nelson decision, "there is no evidence that the need to periodically alternate between sitting and standing prevents [Plaintiff] from performing the jobs identified by the VE." Nelson, 2016 WL 3865856, at *3.

11

Thus, no error occurred with respect to the sit/stand RFC limitation.

In a second argument, Plaintiff contends that the ALJ's RFC finding was not consistent with the U.S. Department of Labor's Dictionary of Occupational Titles ("DOT") and the ALJ should have explained this conflict. Generally, when a VE's testimony conflicts with the DOT's job descriptions, the ALJ must provide a reasonable explanation that resolves the conflict before relying on the VE's testimony. SSR 00–4p, 2000 WL 1898704, at *2 (Dec. 4, 2000). See Poppa v. Astrue, 569 F.3d 1167, 1173-74 (10th Cir. 2009)(ALJ must inquire about and resolve any conflicts between the VE's testimony and DOT's job descriptions).

Although Plaintiff's argument is not clear, Plaintiff appears to be asserting that the ALJ should have elicited an explanation from the VE concerning a conflict between the DOT's job information and the sit/stand limitation ascribed in the RFC. However, "DOT's silence concerning stand/sit options" for a specific job does not constitute a conflict with a VE's testimony that a claimant needs stand/sit options to perform that job. Wahpekeche v. Colvin, 640 Fed. App'x 781, 785–86 (10th Cir. 2016).

No such conflict is described by Plaintiff, and no such conflict is evident from the record. Therefore, the ALJ did not err by failing to address any hypothetical conflict. See id. ("But [plaintiff] fails to demonstrate how any conflict exists between the VE's testimony and the DOT based simply on the DOT's silence concerning sit/stand options. Accordingly, the ALJ had no duty to resolve the alleged 'conflict' before accepting the VE's testimony."); Perez v. Colvin, 2016 WL 1068477, at *5 (E.D. Cal. 2016)("A number of courts, however,

have found that because the DOT does not discuss the availability of a sit/stand option, a VE's testimony about the availability of jobs with a sit/stand option does not raise an apparent conflict with the DOT.")(collecting cases); Sanborn v. Comm'r of Social Sec., 613 Fed. App'x 171, 177 (3rd Cir. 2015) ("The DOT, however, does not include sit/stand options in job descriptions. . . . Accordingly, the ALJ did not erroneously fail to inquire into an explicit conflict between the VE's testimony and the DOT."); Forrest v. Comm'r of Social Sec., 591 Fed. App'x 359, 364 (6th Cir. 2014) ("But the DOT does not discuss whether jobs have a sit/stand option . . . and therefore the vocational expert's testimony supplemented, rather than conflicted with, DOT job descriptions."); Zblewski v. Astrue, 302 Fed. App'x 488, 494 (7th Cir. 2008) ("Because the DOT does not address the subject of sit/stand options, it is not apparent that the testimony conflicts with the DOT.").

V. Evaluation of Medical Source Opinions

Plaintiff next contends that the ALJ erred in evaluating the opinion of the "state agency mental health doctor" because the ALJ ascribed "great weight" to the opinion but did not incorporate "*all* of the doctor's limitations in the RFC or explain why she did not do so." Plaintiff's Opening Brief, at 7-8. Plaintiff refers to the ALJ's statement in her decision that "[t]he State agency's psychologist assessed that the claimant had no medically determinable mental impairment, and that she could perform simple and some complex tasks, could relate to others on a superficial work basis, and could adapt to a work situation . . . . The [ALJ] give[s] great weight to the State agency medical consultants and the State agency psychologist as these findings are consistent with the medical documentation as a whole and

13

with the findings of the [ALJ]." (TR 25).

The VE testified during the hearing that the two sedentary jobs identified as falling within the ALJ's hypothetical RFC are performed at "SVP of 2." (TR 77, 78). This job description is based on the DOT's classification of the specific vocational preparation, or SVP, required for a job, and unskilled work corresponds to an SVP of 1 to 2. See Soc. Sec. Ruling 00-4p, 2000 WL 1898704, *3 (2000)("The DOT lists a specific vocational preparation (SVP) time for each described occupation. Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2 . . ."). Plaintiff has not shown that these jobs would require a skill level beyond that assessed by the state agency medical consultant, Dr. Kampschaefer. Based on the consultant's review of the record, Dr. Kampschaefer stated that Plaintiff was capable of performing work involving simple and some complex tasks. (TR 668).

Plaintiff posits the conclusion that the jobs identified by the VE and relied upon by the ALJ in making the step five decision require "reasoning level 3" which "do not fit the simple and some complex restrictions of the agency great weight doctor." Plaintiff's Opening Brief, at 8. This argument and the following conclusory argument in which Plaintiff merely "challenges the accuracy of the hypothetical questioning of the vocational expert since the questions did not reflect the totality of Claimant's mental impairments" are not sufficiently developed to allow for meaningful judicial review. And no error occurred in the ALJ's analysis of the evidence. Because substantial evidence supports the Commissioner's decision, that decision should be affirmed.

## RECOMMENDATION

In view of the foregoing findings, it is recommended that judgment enter AFFIRMING the decision of the Commissioner to deny Plaintiff's applications for benefits. The parties are advised of their respective right to file an objection to this Report and Recommendation with the Clerk of this Court on or before     December 12th, 2016, in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72. The failure to timely object to this Report and Recommendation would waive appellate review of the recommended ruling. Moore v. United States, 950 F.2d 656 (10th Cir. 1991); cf. Marshall v. Chater, 75 F.3d 1421, 1426 (10th Cir. 1996)("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived.").

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter, and any pending motion not specifically addressed herein is denied.

ENTERED this    22nd    day of    November   , 2016.

GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE